**State of NORTH CAROLINA, ex rel. Roy COOPER, Attorney General, Plaintiff,**

v.

**TENNESSEE VALLEY AUTHORITY, Defendant.**

**Civil No. 1:06CV20.**

United States District Court, W.D. North Carolina, Asheville Division.

Jan. 13, 2009.

Michael David Goodstein, Anne Elizabeth Lynch, Stacey Heather Myers, Resolution Law Group, Richard E. Ayres, Ayres Law Group, Washington, DC, James C. Gulick, Marc Bernstein, N.C. Department of Justice, Raleigh, NC, Robert L. Gonser, Resolution Law Group, P.C., Lafayette, CA, Sueanna Peeler Sumpter, N.C. Dept. of Justice, Asheville, NC, for Plaintiff.

Frank Hilton Lancaster, Albert Jackson Woodall, Thomas Fleming Fine, TVA Office of General Counsel, Harriet Andrea Cooper, Tennessee Valley Authority, Maria Victoria Gillen, William Thaddeus Terrell, Knoxville, TN, Michael Kent Stagg, Paul G. Summers, Robert J. Martineau, Jr., William Kenneth Koska, Waller, Lansden, Dortch & Davis LLP, Nashville, TN, for Defendant.

### *MEMORANDUM OF OPINION*

LACY H. THORNBURG, District Judge.

**THIS MATTER** came on for trial before the Court without a jury. The Court now enters its findings of fact, conclusions of law, and final judgment in this matter.

## I. INTRODUCTION

Plaintiff North Carolina, on behalf of its citizens, filed the instant action in public nuisance against Defendant Tennessee Valley Authority (TVA) in January 2006. The complaint cites urgent environmental concerns in this state, allegedly caused by air pollution emitted by TVA's coal-fired power plants in other states. North Carolina contends, and TVA denies, that airborne particles from TVA's electricity generating plants enter North Carolina in unreasonable amounts, thereby threatening the health of millions of people, the financial viability of an entire region, and the beauty and purity of a vast natural ecosystem. North Carolina further alleges, and TVA denies, that TVA's air pollution costs the state government and its citizens billions of dollars every year in health care expenses, sick days, and lost tourism revenue; and that there are also less quantifiable costs to be considered, stemming from the loss of human, animal, and plant life and irreversible environmental damage in protected wilderness areas.

TVA does not deny that some of its emissions enter North Carolina, but disputes the amount of such emissions and suggests that the adverse environmental effects experienced by North Carolina are largely attributable to this state's own electric utilities and other industrial sources, or to private sources such as automobile and truck emissions. Further, as evidence that TVA is acting reasonably, TVA cites its millions of customers' undeniable need for—and expectation of—reliable, inexpensive sources of energy, deployed to serve the homes and businesses of the rapidly growing population in the southeastern United States. Finally, TVA points to its own efforts to reduce its plants' emissions, as further evidence that those TVA emissions which do enter North Carolina do not do so in unreasonable amounts.

The parties do agree on one thing: the pollution controls that North Carolina contends are necessary to abate TVA's alleged public nuisance are very costly. North Carolina's experts contend the relief it seeks would cost $3 billion. TVA's experts put that figure at $5 billion. TVA's customers, spread throughout seven states (including North Carolina itself), would inevitably bear the vast majority of such costs.

The ancient common law of public nuisance is not ordinarily the means by which such major conflicts among governmental entities are resolved in modern American governance. Instead, the federal executive branch (through its arm, the Environmental Protection Agency, or EPA) has traditionally been the chief arbiter of interstate air pollution concerns. The executive branch's authority to govern in this arena dates to at least 1955, when Congress passed clean air legislation directing the Surgeon General and the Secretary of Health, Education, and Welfare to work with state and local authorities in mitigating "the dangers to public health and welfare, injury to agricultural crops and livestock, damage to and deterioration of property, and hazards to air and ground transportation from air pollution." **Act of July 14, 1955, Pub. L. No. 360–159, 69 Stat. 322, (codified as amended at 42 U.S.C. § 7401 et seq.).** This brief statute, the genesis of the modern Clean Air Act (CAA), has since evolved into an elaborate scheme of regulation and administrative review intended as "a lengthy, detailed, technical, complex, and comprehensive response to a major social issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 848, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Indeed, even in the present dispute, North Carolina began its pursuit of relief by utilizing the normal administrative channels established by the CAA. *See North Carolina v. Envtl. Prot. Agency,* 531 F.3d 896, 905 (D.C.Cir.2008) (per curiam); **Rulemaking on Section 126 Petition from North Carolina to Reduce Interstate Transport of Fine Particulate Matter and Ozone, 71 Fed.Reg. 25,328 (Envtl. Prot. Agency Apr. 28, 2006).** Although the administrative route has certainly borne some interesting fruit,[1] it has not, thus far, resulted in the reduction of emissions from upwind, out-of-state sources that North Carolina is ultimately seeking.[2]

North Carolina now turns to the federal courts as the final source of relief in its efforts to curb the out-of-state air pollution which the state believes clouds its scenic vistas, poisons its wildlife, and sickens its people. The undersigned has previously held that the CAA's comprehensive scheme for the adjudication of interstate pollution disputes does not impair the inherent equitable powers of this Court to address North Carolina's concerns. *See North Carolina v. Tenn. Valley Auth.,* 549 F.Supp.2d 725, 729 (2008) (**discussing CAA savings clause, 42 U.S.C. § 7604(e), which permits actions to abate air pollution pursuant to state law doctrines, such as public nuisance).** Indeed, the judiciary has always played a significant role in the abatement of public nuisances, particularly when such lawsuits are brought by the United States or by sovereign states. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 603–05, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982) (**listing and discussing *parens patriae* cases involving suits to enjoin public nuisance).** *See generally* **Bradford Mank, *Should States Have Greater Standing Rights Than Ordinary Citizens?: Massachusetts v. EPA's New Standing Test for States,* 49 Wm. & Mary L.Rev. 1701,**

---

**1.** The D.C. Circuit's July 2008 decision in *North Carolina v. EPA* to vacate the Clean Air Interstate Rule (CAIR) is undoubtedly far-reaching, and the ruling's ultimate impact on North Carolina's air quality remains unclear. 531 F.3d at 929–30. CAIR and its associated federal implementation plan are currently on remand to the EPA. *Id.* at 930; *see also North Carolina v. Envtl. Prot. Agency,* 550 F.3d 1176, 1177–78, 2008 WL 5335481 at *1 (D.C.Cir. 2008) (per curiam) (**amending the July 2008 decision to reflect that CAIR would be remanded to the EPA without vacatur, because** "notwithstanding the relative flaws of CAIR, allowing CAIR to remain in effect until it is replaced by a rule consistent with our opinion would at least temporarily preserve the environmental values covered by CAIR").

**2.** North Carolina lawmakers have determined that the air in this state should be cleaner than what the EPA's national ambient air quality standards currently permit. *See* **An Act to Improve Air Quality in the State (Clean Smokestacks Act), 2002 N.C. Sess. Laws 4, codified at N.C. Gen.Stat. §§ 62–133.6, 143–215.107 to 143–215.114B.** To this end, the state has enacted statutory emission controls for the pollution sources within its own borders. **Clean Smokestacks Act § 1, N.C. Gen.Stat. § 143–215.107D (setting caps on $NO_x$ and $SO_2$ emissions from pollution sources in North Carolina).** Not content with in-state reductions in emissions, the same act provides:

> It is the intent of the General Assembly that the State shall use all available resources and means, including negotiation, participation in interstate compacts and multistate and interagency agreements, petitions pursuant to 42 U.S.C. § 7426, and litigation to induce other states and entities, including Tennessee Valley Authority, to achieve reductions in emissions of oxides of nitrogen and sulfur dioxide comparable to those required [in this Act], on a comparable schedule. The State shall give particular attention to those states and other entities whose emissions negatively impact air quality in North Carolina or whose failure to achieve comparable reductions would place the economy of North Carolina at a competitive disadvantage.

Clean Smokestacks Act § 10.

1756–62 (2008) (discussing the relaxed standing requirements for **parens patriae** suits by states seeking to enjoin public nuisance). This is partly because of "the extraordinary weight courts of equity place upon the public interests in a suit involving more than a mere private dispute, and ... the deference courts afford the political branches in identifying and protecting the public interest." *United States v. Marine Shale Processors,* 81 F.3d 1329, 1359 (5th Cir.1996) **(internal citation omitted); see also** *United Steelworkers of Am. v. United States,* 361 U.S. 39, 60–61, 80 S.Ct. 177, 4 L.Ed.2d 169 (1959) **(Frankfurter, J., concurring) (discussing the judiciary's historic use of equity powers, at the request of a sovereign, to enjoin activity found to be a public nuisance).**

For this reason, "unless Congress has narrowed an equity court's flexibility in the context of a particular statutory scheme, the issuance of an injunction remains an exercise of the district court's discretion." *Marine Shale Processors,* 81 F.3d at 1359; **see also** *Georgia v. Tenn. Copper Co.,* 206 U.S. 230, 238, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) **(in the context of an environmental suit by a state to protect the public interest, refusing to abandon "the considerations that equity always takes into account").** Indeed, this Court is required to exercise such equitable discretion, provided it has the jurisdiction to do so. *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) **("We have no more right to decline the exercise of jurisdiction that is given, than to usurp that which is not given. The one or the other would be treason to the constitution.").**

While it cannot be denied that the federal judiciary, including this Court, is a proper forum for the adjudication of North Carolina's claims, it is also true that the public nuisance principles which this Court is bound to apply are less well-adapted than administrative relief to the task of implementing the sweeping reforms that North Carolina desires. As explained further below, the elements of public nuisance include strict requirements as to both causation and unreasonableness of the harm. Both these elements have played a significant role in the Court's analysis of the facts presented by the parties in this case, and in the crafting of the injunctive remedies set forth herein. Although the parties have indicated—and the Court does not disagree—that a system-wide cap on TVA is both more efficient from a business standpoint and also more effective at diminishing overall pollution, the restrictive nature of public nuisance doctrines does not allow such a remedy, at least on the facts presented here. Consequently the Court, of necessity, adopted a plant-by-plant analysis, as set forth below.

## II. PROCEDURAL HISTORY

On January 30, 2006, North Carolina filed the instant complaint against TVA, alleging that TVA's coal-fired power plants were and are a public nuisance. The complaint seeks injunctive relief as well as attorney's fees and costs. **Complaint, filed January 30, 2006, at 1.**

On April 3, 2006, TVA filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), on the grounds that this Court lacked subject matter jurisdiction over North Carolina's claim. **Defendant's Motion to Dismiss, filed April 3, 2006, at 1.** The Court denied TVA's motion to dismiss but certified the order for immediate appeal to the Fourth Circuit, pursuant to 28 U.S.C. § 1292(b). **Memorandum and Order,** 439 F.Supp.2d 486, 497 (W.D.N.C.2006); **Order Certifying for Immediate Appeal, filed September 7, 2006, at 7.** On January 31, 2008, the

Fourth Circuit affirmed this Court's order denying TVA's motion to dismiss. *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344 (4th Cir.2008). The Fourth Circuit later denied TVA's petition for rehearing and rehearing *en banc.* **Order of Fourth Circuit Court of Appeals, filed March 27, 2008.**

Both parties moved for summary judgment, and this Court denied TVA's motion and granted in part and denied in part North Carolina's motion. **Order,** 549 F.Supp.2d 725, 736 (W.D.N.C.2008).

The undersigned presided over a twelve-day bench trial in July 2008. In September 2008, following the trial, the parties submitted proposed findings of fact and conclusions of law, which the Court has considered. This Order constitutes the Court's own findings of fact and conclusions of law.

## III. FINDINGS OF FACT

### A. Parties

1. Plaintiff in this action is the State of North Carolina ("North Carolina"), acting by and through its Attorney General. Defendant is Tennessee Valley Authority ("TVA"), a federal entity governed by United States Code Title 16, Chapter 12A.

2. TVA's statutory mandate directs it to generate and sell electricity (among other functions). **16 U.S.C. § 831i.** Pursuant to its mandate, TVA operates the nation's largest public electricity-producing system, serving a major geographic area. **Trial Transcript (hereinafter, "Transcript") at 311–13.** This system provides electricity to most of Tennessee; large portions of Kentucky, Mississippi, and Alabama; and small portions of northeastern Georgia, western North Carolina, and southwestern Virginia. **TVA Trial Exhibit (hereinafter, "TVA Exh.") 1.** In 2007, TVA's electricity generation resulted in sales revenue of more than $9.2 billion. **Transcript at 1658.**

3. Much of TVA's electricity generation takes place at its fleet of 11 coal-fired power plants ("plants"), seven of which are in Tennessee, two in Kentucky, and two in Alabama. **Transcript at 311, 1818.**

4. TVA's Tennessee plants are Bull Run, Kingston, John Sevier, Gallatin, Johnsonville, Cumberland, and Allen. Its Kentucky plants are Paradise and Shawnee. Its Alabama plants are Widows Creek and Colbert. **TVA Exh. 1.**

5. All told, these 11 plants contain 59 electrical generating units ("EGUs"), distributed as follows:

- Bull Run: 1 EGU
- Kingston: 9 EGUs
- John Sevier: 4 EGUs
- Gallatin: 4 EGUs
- Johnsonville: 10 EGUs
- Cumberland: 2 EGUs
- Allen: 3 EGUs
- Paradise: 3 EGUs
- Shawnee: 10 EGUs
- Widows Creek: 8 EGUs
- Colbert: 5 EGUs

**TVA Exh. 2.** All of these 59 EGUs are at least 35 years old, and 40 of them are at least 50 years old. **Transcript at 312.**

### B. Electrical Generating Units

6. A typical TVA EGU operates in the following manner. The EGU receives coal via conveyor belt and burns the coal in a boiler, producing very high heat. The heat generated in the coal combustion is used to convert water into high-pressure steam. The steam turns a turbine, which is connected to a generator. The generator then produces electricity, the final product. **Transcript at 327–29; North Carolina Trial Exhibit (hereinafter, "NC Exh.") 59, 61.**

7. The coal that TVA uses in its EGUs contains—among other things—nitrogen, sulfur, and mercury. **Transcript at 331, 335.** The process of combustion inside an EGU boiler causes the coal to undergo chemical changes, which release the nitrogen, sulfur, and mercury in their elemental form. *Id.* at 335–36.

8. During combustion, nitrogen released from the burning coal combines with ambient oxygen, forming nitrogen oxide (NOx). Additional $NO_x$ may also be formed by the oxidization of ambient nitrogen during combustion. *Id.* at 335, 1821. Once it is formed inside the EGU boiler, the $NO_x$ (if untreated) travels through an attached smokestack and is released into the atmosphere. **NC Exh. 59.**

9. Sulfur dioxide ($SO_2$) is another byproduct of coal combustion inside an EGU. Like $NO_x$, $SO_2$ is formed inside an EGU boiler when sulfur released by the burning coal unites with ambient oxygen. Also like $NO_x$, $SO_2$ travels up the EGU smokestack and is released into the atmosphere unless it is treated first. **Transcript at 333–35.**

10. Although most of the coal fed into the EGU is consumed in the combustion process, a certain remnant is left over. This remnant, which takes the form of a tiny airborne solid, is commonly referred to as primary particulate matter (PM). Like $NO_x$ and $SO_2$, primary PM (if untreated) goes up the smokestack. *Id.* at 332–33.

11. As discussed above, a third component of coal is mercury. Combustion in the EGU boiler releases the mercury from the coal. Afterwards, the mercury particles frequently attach themselves to the primary PM before the PM goes up the smokestack. *Id.* at 333, 336. Other mercury particles are converted into a gaseous form and pass up the smokestack on their own. *Id.* at 336–37.

12. A "primary pollutant" is a pollutant emitted directly from an emission source. As described above, the primary pollutants at issue in this lawsuit are $SO_2$, $NO_x$, and mercury (on its own and/or attached to primary PM). **NC Exh. 1 at 3.2.** A "secondary pollutant," on the other hand, forms by means of chemical changes in the atmosphere following emission. *Id.* The secondary pollutants at issue here are $O_3$ and $PM_{2.5}$, as explained below.

### C. Atmospheric Science

13. $NO_x$ is the basic building block for the molecule commonly known as "ozone" or $O_3$. Specifically, ozone is formed when $NO_x$ enters the atmosphere from an EGU smokestack or other source[3] and is exposed to sunlight. The sunlight chemically changes the NOx molecules, causing oxygen to break off and form $O_3$. **Transcript at 632–33; NC Exh. 1 at 3.2.** Because of the necessary role of sunlight in this process, ozone formation is faster on hot, sunny days than on cool, cloudy days. **NC Exh. 1 at 3.2.** Along with abundant sun, the presence of volatile organic compounds ("VOCs") in the atmosphere can also accelerate ozone formation. **Transcript at 633.**

14. The CAA empowers the EPA to regulate air pollutant levels in the atmosphere. **42 U.S.C. §§ 7408–7809 (directing the EPA to compile a list of air pollutants and corresponding air quality criteria).** $O_3$ is among the pollutants so regulated. The EPA has set the national ambient air quality standard (NAAQS) for ozone at 0.075 parts per million (ppm) per 8–hour average. **National Ambient Air Quality Standards for Ozone, 73 Fed.**

---

3. In addition to EGUs, highway vehicles are another major resource of $NO_x$ emissions.

NC Exh. 1 at 3.2.

Reg. 16,436 (Envtl. Prot. Agency Mar. 27, 2008). This NAAQS was set fairly recently in March 2008, and the EPA is still considering which of North Carolina's counties (if any) will be considered "non-attainment" for 8–hour ozone. *Id.*; Transcript at 2727.

15. In addition to forming ozone, $NO_x$ in the atmosphere can also form nitrate ($NO_3$). Likewise, $SO_2$ in the atmosphere tends to turn into sulfate ($SO_4$) or a variation thereof, such as ammonium sulfate or sulfuric acid. Nitrate and sulfate are significant components of a group of tiny airborne solids that can be found in the atmosphere in varying concentrations nationwide. Collectively, these solids are commonly referred to as $PM_{2.5}$, because they have a diameter of 2.5 microns or less. **Transcript at 334, 633–34, 1380; NC Exh. 1 at 3.2, 4.2.** By way of comparison, a human hair has a diameter of 50–70 microns. Dust, pollen, and mold are typically about 10 microns in diameter. **NC Exh. 125.**[4]

16. The EPA has set the current NAAQS for $PM_{2.5}$ at 15 micrograms per cubic meter ($\mu g/m^3$) for the annual average concentration. **National Ambient Air Quality Standards for Particulate Matter, 71 Fed.Reg. 61,144 (Envtl. Prot. Agency Oct. 17, 2006).** In North Carolina, three counties are currently considered "non-attainment" for purposes of the $PM_{2.5}$ NAAQS: Catawba, Davidson, and Guilford. **Transcript at 2665–66.**

17. Although small amounts of $PM_{2.5}$ are emitted directly from the smokestacks of coal-fired EGUs, more than 90% of ambient $PM_{2.5}$ is formed when $NO_x$, $SO_2$, and other airborne particles undergo chemical changes in the atmosphere itself, after they have been emitted. **Transcript at 637; NC Exh. 1 at 2.19.**

18. Compared to ozone, $PM_{2.5}$ is chemically complex. In addition to nitrates and sulfates, it often contains carbon, ammonium, and/or soil dust. **Transcript at 633–34, 637–38; NC Exh. 1 at 3.2.** In the eastern United States, however, the atmospheric $PM_{2.5}$ is predominantly made up of sulfate. **Transcript at 638.** Much, if not most, of this atmospheric sulfate is formed from $SO_2$ emitted by coal-fired power plants. *Id.*; NC Exh. 1 at 2.17, 3.2.

19. Portions of atmospheric sulfate, nitrate, and other $PM_{2.5}$ components remain in the air for long periods of time. Other portions travel to the earth's surface through a variety of processes known collectively as acid deposition. For example, wet acid deposition occurs when atmospheric $PM_{2.5}$ unites with water precipitation in the form of rain, hail, or snow. (This phenomenon is often colloquially called "acid rain.") Dry deposition, by contrast, occurs when $PM_{2.5}$ travels to earth without uniting with precipitation. Finally, a third kind of acid deposition is cloudwater deposition, which occurs most frequently in mountainous areas because they are prone to be foggy or immersed in clouds. In this process, $PM_{2.5}$ unites with water droplets in clouds or fog, which then deposit on forest canopies and other surfaces. **NC Exh. 1 at 6.1.**

### D. Available Air Pollution Control Technologies

20. Over the years, a variety of pollution control technologies have been developed to diminish coal-fired plants' emissions of primary pollutants, thereby decreasing the incidence of secondary pollutants in the atmosphere. For example, some types of coal naturally contain less sulfur and nitrogen than other

---

4. The Court notes that NC Exh. 125, a rendering explaining the scale of PM, was shown to the Court to illustrate testimony, but was never actually admitted into the evidence.

types, and consequently they release fewer pollutants during combustion. **Transcript at 359.**

21. As to SO₂, the primary pollution control mechanism at issue in this litigation is the flue gas desulfurizer (commonly known as a scrubber). *Id.* 361–64. Scrubbers, which use chemical processes to remove SO₂ from the flue gas, come in two varieties: wet and dry. *Id.*; **NC Exh. 81 (providing an illustration of a wet scrubber).** Dry scrubbers can be expected to remove over 90% of SO₂ from the flue gas; wet scrubbers remove as much as 98% or more. **Transcript at 362, 364.** Scrubbers are typically very large; one witness stated, "you can think of [a scrubber] as almost adding a chemical plant to a coal-fired power plant. They're multiple buildings. They're several stories. They have very large footprints .... oftentimes even larger than the original plant itself." **Transcript at 1822.**

21. As to NOₓ, the primary pollution control mechanisms at issue in this lawsuit are selective catalytic reduction (SCRs) and selective non-catalytic reduction (SNCRs). SCRs work by converting NOₓ in the flue gas into molecular nitrogen and water, which have no air pollution impact. *Id.* at 341; **NC Exh. 71 (providing an illustration of SCR operation).** Like scrubbers, they are typically very large and often require custom engineering when they are retrofit onto aging EGUs. **Transcript at 346, 357.** SCRs can remove about 90% of the NOₓ in the flue gas. *Id.* at 357.

23. Like SCRs, SNCRs work by converting a portion of the NOₓ in the flue gas into molecular nitrogen. *Id.* at 357–58; **TVA Exh. 241 at 13 (providing an illus-**

trated description of SNCR operation). SNCRs, however, remove only 20%–40% of the NOₓ from the flue gas. They do have an advantage over SCRs in that they are not as large, and their installation costs are about one-tenth of the costs of an SCR. **Transcript at 358–59.**

24. Although SCRs and scrubbers are primarily geared toward NOₓ and SO₂ reductions, they also have a side benefit, in that they remove significant amounts of mercury from the smokestack plume. *Id.* at 336–37, 1824. In particular, the combined use of a wet scrubber and an SCR achieves very high mercury reductions, generally 85–90%. *Id.* at 336–37, 1824–25.

## E. Effects of PM₂.₅ on Human Health

25. PM₂.₅ exposure has significant negative impacts on human health, even when the exposure occurs at levels at or below the NAAQS. **Transcript at 1076–77; NC Exh. 467 at 1, 3.**

### 1. *Premature Mortality*

26. Exposure to—and inhalation of—air containing PM₂.₅ is 90–100% certain to cause premature mortality in humans. **Transcript at 1037–38, 1130–31; NC Exh. 242 at viii, 3–23, 3–24.[5]**

27. Specifically, PM exposure and inhalation can have the following effects on human health, any or all of which can lead to premature death:

(a) *Systemic inflammatory response.* PM inhalation causes pulmonary inflammation, which in turn tends to cause a more general system-wide inflammation in the body. This inflammation impacts platelet function, which contributes to the development

5. NC Exh. 242 is a 2006 expert report commissioned by the EPA for reasons entirely unrelated to this lawsuit. In light of the resulting objectivity, the Court finds the report to be uniquely compelling in the area of premature mortality resulting from PM₂.₅ exposure.

of blood clots—a common cause of heart attacks and strokes. **NC Exh. 468 at 3; Transcript at 916–18.**

(b) *Vascular reactivity.* Systemic inflammation can also cause changes in vascular activity that decrease the amount of blood flow to important organs, including the heart and brain. Specifically, it affects the ability of blood vessels to remain sufficiently dilated for adequate blood flow to tissues. Such blood vessels also become less responsive to drugs designed to increase blood flow—including coronary blood flow. **NC Exh. 468 at 3–4; Transcript at 915–16.**

(c) *Cardiac rhythms.* PM inhalation also causes neurological changes affecting reflexes and autonomic control of cardiac rhythms. This can result in heart rate variability and ultimately arrhythmia, the immediate cause of death in most fatal heart attacks. **NC Exh. 468 at 3; Transcript at 911–15.**

(d) *Infant mortality.* There is a growing body of evidence that infant deaths can be linked to changes in ambient PM. Such infant deaths are attributable to respiratory problems and sudden infant death syndrome (SIDS). **NC Exh. 467 at 1.**

28. North Carolina presented evidence that TVA's adoption of the emission controls requested by North Carolina would eliminate enough $PM_{2.5}$ from the air to save an estimated 98 lives in North Carolina per year. **NC Exh. 231–33; Transcript at 1071.** The Court believes that this precise estimate is fraught with uncertainty, due to disagreement among leading experts about the percentage decreases in premature mortality likely to result from incremental decreases in $PM_{2.5}$. **NC Exh. 242 at viii.**

29. Nonetheless, based on the totality of the evidence, the Court finds that, at a minimum, there is an increased risk of incidences of premature mortality in the general public associated with $PM_{2.5}$ exposure, even for levels at or below the NAAQS standard of 15 $\mu g/m^3$.

## 2. *Other Negative Health Impacts*

30. There is also a causal relationship between $PM_{2.5}$ (at NAAQS levels and below) and increased incidence of asthma, chronic bronchitis, and other cardiopulmonary illness. **Transcript at 909, 929–30; NC Exh. 467 at 1, 3; NC Exh. 468 at 8–9.** Although the underlying mechanisms for these effects are not entirely understood, it is likely that they have their root in the inflammation and changes in immune function that result from PM exposure. **NC Exh. 467 at 2.**

31. TVA's expert epidemiologist expressed skepticism about whether exposure to $PM_{2.5}$ at or below NAAQS levels results in adverse cardiopulmonary effects, claiming that, although such a causal relationship could not be ruled out, it was by no means certain. **Transcript at 2363.** As evidence of the extreme uncertainty of this science, the expert cited one study which purported to prove that $NO_2$ exposure actually *protects* human health—an absurd conclusion which even the TVA expert himself did not endorse. **Transcript at 2357.**

32. After reviewing the totality of this evidence, the Court is convinced that exposure to $PM_{2.5}$—even at or below the NAAQS of 15 $\mu g/m^3$—results in adverse cardiopulmonary effects, including increased or exacerbated asthma and chronic bronchitis.[6] The Court believes that

---

**6.** This finding is not inconsistent with EPA regulations, because EPA does not purport to

set the NAAQS at a level which would entirely

TVA's experts' suspicion of this conclusion is unwarranted; indeed, their skepticism runs counter to the vast majority of scientific studies. **NC Exh. 468 at 2–9 (describing these studies in great detail).**

33. These negative but non-fatal health effects result in numerous social and economic harms to North Carolinians, including lost school and work days, increased pressure on the health industry due to extra emergency room and doctor visits, and the general loss of well-being that results from chronic health problems. It is fatuous, at best, to suggest that the previously discussed pollutants protect or promote good personal or environmental health in North Carolina.

### F. Effects of $PM_{2.5}$ on the Environment

34. As previously noted, $PM_{2.5}$ contributes significantly to the phenomenon of acid deposition, including wet, dry, and cloudwater deposition. **Finding of Fact 19,** *supra.*

35. Acid deposition in the form of sulfate, when deposited on the ground, lowers the pH of the soil—that is, it makes the soil more acidic. **Transcript at 213; NC Exh. 1 at 6.4–6.8.** Once the acidity of the soil reaches a certain threshold, aluminum occurring naturally in the earth's crust is mobilized. **Transcript at 213.** This aluminum is toxic to the ecosystem. *Id.* For example, it clogs (and eventually kills) the fine roots of local vegetation, including trees, making it more difficult for the overall root systems to absorb water and nutrients from the soil. *Id.* at 217. This process, in addition to inhibiting healthy growth, also exacerbates the damage caused by any droughts that may otherwise occur. *Id.*

36. Sulfate also removes magnesium, calcium, and potassium from the soil. *Id.*

at 214–15. These nutrients are essential for healthy forest growth. *Id.* at 215. Calcium, for example, is the primary component of cell walls in vegetation; and magnesium is central to photosynthesis. *Id.*

37. High levels of acid deposition in the soil have been reported in important natural wilderness areas in North Carolina, especially western North Carolina. For example, soil in the Linville Gorge Wilderness Area, located in Pisgah National Forest, is well below the pH threshold at which toxic aluminum mobilization occurs. *Id.* at 218.

38. Acid deposition, if it occurs anywhere near the watershed of running water, also degrades water quality by lowering pH and increasing aluminum content. *Id.* at 218–19; **NC Exh. 1 at 6.11–6.15.**

39. These trends of water and soil damage from acid deposition are uniquely difficult to reverse in western North Carolina, because the area already has naturally low levels of magnesium, calcium, potassium, and other bases which could counteract the acid and balance out pH levels. **Transcript at 220; NC Exh. 1 at 6.14.**

### G. Other Effects of $PM_{2.5}$

40. $PM_{2.5}$, especially $SO_2$, has significant effects on visibility due to its efficient scattering of light. **Transcript at 1380; NC Exh. 289.** An observer of a scenic vista would experience this scattering of light as haze; the observer's perception of the haze changes depending on how much $PM_{2.5}$ is present in the atmosphere. **NC Exh. 295.**

41. Western North Carolina is home to many cherished, pristine wilderness areas such as the Great Smoky Mountains National Park, Linville Gorge, Shining Rock,

preclude negative health outcomes. **Transcript at 1076–77.**

Grandfather Mountain, and Chimney Rock State Park. **Transcript at 192–93, 1300, 1339, 1761–62.** Moreover, the region also features world-famous attractions such as the Appalachian Trail, the Blue Ridge Parkway, and the Biltmore Estate. *Id.* at 1244, 1271, 1323. These areas contain countless scenic vistas which are vulnerable to the effects of $PM_{2.5}$ haze.

42. Regarding the Blue Ridge Parkway alone, a recent survey indicated that the average visitor would be willing to pay an extra $328.00 in federal income taxes per year in order to improve visibility in the North Carolina section of the Parkway. When aggregated for the total number of visitors to the Parkway in North Carolina, the value of increased visibility is $760 million per year. *Id.* at 1271–73.

43. It can be inferred from these facts that the visibility at scenic overlooks in the western North Carolina mountains is an extremely valuable resource to this state. $PM_{2.5}$ haze and other air pollution impacting visibility at these vistas creates a difficult problem from both a social and economic perspective.

## H. Effects of $O_3$ on Human Health

44. Ozone, like PM, is associated with premature mortality in humans. **Transcript at 1039–40.**

45. In addition to premature death, ozone exposure has two primary health effects in humans. First, it induces an immediate sensation of pain and difficulty in taking a deep breath. *Id.* at 909–10. This sensation is often accompanied by a tight, painful feeling in the chest. *Id.* at 925. The feelings of pain and discomfort generally subside after a few hours after the exposure to ozone-polluted air is over. *Id.* at 925–26.

46. A second, more long-lasting effect of ozone exposure is increased airway in-flammation. *Id.* at 910. The increase in inflammation exacerbates asthma symptoms and increases negative responses to pre-existing allergens. *Id.* at 921.

47. The asthma exacerbation caused by $O_3$ has particularly serious consequences for individuals with undiagnosed—and thus uncontrolled—asthma. *Id.* at 974. If a person's asthma and accompanying lung inflammation remain uncontrolled for more than two or three years, the person can develop irreversible scarring on his or her lungs, to a point where 10% to 60% of lung capacity is irretrievably lost. *Id.* at 975.

48. It is well-established in the scientific literature that ozone contributes significantly to these bad health effects, even at or below NAAQS levels. *Id.* at 920.

49. Governmental organizations and businesses who operate in areas affected by ozone frequently must issue advisories to their guests, customers, and employees on high-ozone days. For example, the Biltmore Estate has a policy of giving its staff more frequent breaks on such days. *Id.* at 1323. The National Park Service also encourages its staff and visitors to refrain from prolonged outdoor activities in the Great Smoky Mountains National Park when ozone levels are high. *Id.* at 1361.

## I. Effects of $O_3$ on the Environment

50. Ozone in sufficiently high concentrations can damage plants, including commercial crops as well as natural-grown vegetation. **NC Exh. 1 at 5.3.** In particular, ozone causes plant leaves to develop black discoloration caused by damage to cell walls and chloroplasts (the primary engine for photosynthesis). *Id.*; **NC Exh. 276 at 8 (pictures of leaf discoloration).**

51. Examples of native North Carolina species that are especially sensitive to ozone are: Virginia creeper, sassafras,

sweetgum, Allegheny blackberry, mountain dandelion, milkweed, aster, ash, pine, American sycamore, American elder, and quaking aspen. **NC Exh. 276 at 9 (listing over twenty-five ozone-sensitive species that grow along the Appalachian National Scenic Trail).**

**J. North Carolina–Based Impacts of Pollutants from TVA Plants**

52. Emissions of primary pollutants have the greatest negative impacts in the areas closest to the source itself. *Id.* at 1777–78, 2210; NC Exh. 1 at vii. Unbiased studies show that emissions reductions in a particular state will generate the most benefit within that state. **NC Exh. 1 at vii.**

53. Nonetheless, emissions from a source located outside a state, particularly an upwind source, can still have significant impacts on that state's air quality. **NC Exh. 1 at vii.**

54. In the southeastern United States, high-pressure weather systems tend to move air pollution from west to east. **Transcript at 784, 789–90, 2687.** As a result, decreases in primary upwind emissions in the western part of the region result in relatively linear decreases in secondary air pollutants in the eastern part of the region. *Id.* at 2320.

55. The greatest negative impacts from pollution emitted by TVA power plants accrue close to those plants, with lesser impacts at greater distances. **NC Exh. 148, 149, 155, 156; Transcript at 792–93.** For example, visibility is impacted by plants as far as 200–300 miles away. **Transcript at 1408–09.**

56. There are four plants in the TVA system within 100 miles of North Carolina:

John Sevier, Bull Run, and Kingston in Tennessee; and Widows Creek in Alabama (hereinafter, the "100–Mile Plants"). **TVA Exh. 1 (map with scale drawing).**

57. In 2002, the 100–Mile Plants caused annual average $PM_{2.5}$ concentrations to climb by 0.4–0.5 $\mu g/m^3$ in numerous counties in western North Carolina, and 0.3–0.4 $\mu g/m^3$ in many other North Carolina counties. **Transcript at 802; NC. Exh. 148, 149; TVA Exh. 345 at Fig. 5–A.** By way of context, North Carolina's annual average $PM_{2.5}$ concentrations from 1999 and 2005 ranged between 12.6 and 15.2 $\mu g/m^3$. **NC Exh. 134.**

58. Half of a microgram of impact is very significant amount of impact. **Transcript at 806.** As noted above, the NAAQS for $PM_{2.5}$ is 15 $\mu g/m^3$, and very negative effects on human health, visibility, and the environment can result at levels well below 15 $\mu g/m^3$. **Finding of Fact 16, 32,** *supra.*

59. The 100–Mile Plants also contribute very significantly to ozone levels within numerous North Carolina counties. Specifically, these plants contribute 4–8 parts per billion (ppb) to peak 8–hour ozone concentrations in much of western North Carolina, and 2–4 ppb to other parts. **NC Exh. 155.** By way of comparison, the NAAQS for ozone is 75 ppb.[7] **Finding of Fact 14,** *supra.* North Carolina's average 8–hour ozone concentrations from 1999 and 2005 ranged between 73 to 94 ppb. **NC Exh. 133.** Again, as noted, ozone has bad effects on human health and the environment even at concentrations well below the NAAQS. **Finding of Fact 48,** *supra.*

60. In addition to the four 100–Mile Plants, TVA has seven other plants in its system. **TVA Exh. 1.** Data from both

7. Even more tellingly, about 40 ppb of ozone occurs naturally in the air in western North Carolina—leaving only 35 ppb which may permissibly be caused by human sources under EPA's own guidelines. **Transcript at 791.**

parties show that emissions from these seven plants do not have nearly the same impact on North Carolina's air as the easternmost four.

61. For example, TVA's two Kentucky plants, together, contribute less than 0.1 $\mu g/m^3$ to the annual average $PM_{2.5}$ of any North Carolina county. **TVA Exh. 345 at Fig. 5–A.** Similarly, the conglomerate effect of the four TVA plants located in middle and western Tennessee is also less than 0.1 $\mu g/m^3$ per county. *Id.* Although the Court has no doubt of these plants' negative impact on their more immediate environs, the record indicates that their impact on North Carolina is less significant.

62. As of trial, the state of pollution controls [8] at the four 100–Mile Plants was as follows:

- *Bull Run,* which has one EGU, has an SCR in place and, at the time of trial, had a scrubber under construction. **Transcript at 1830–32, 2008–12.** The scrubber, as scheduled, went online prior to December 31, 2008.
- *Kingston,* which has nine EGUs, has SCRs in place on all nine units. Two scrubbers are under construction: one scrubber for Units 1–5 and one scrubber for Units 6–9. One of the scrubbers is scheduled to go online in 2009, the other in 2010. *Id.* at 1832, 2012–18.
- *John Sevier,* which has four EGUs, has no scrubbers and no SCRs. TVA claims that it has plans in the works to build scrubbers and SCRs sufficient to cover all four EGUs. One of the units already has a SNCR, and TVA claims it will build SNCRs for the other three units, which will operate while the necessary SCR equipment is being built. *Id.* at 1832, 2018–21.
- *Widows Creek,* which has eight EGUs, has one unit with an SCR and a recently modernized scrubber; one unit with an SCR and an old scrubber which is scheduled to be modernized; and six units with no scrubbers and no SCRs. *Id.* at 1836, 2055–56.

63. With respect to the 100–Mile Plants, the following pollution controls are warranted:

- *Bull Run:* Complete installation of the scrubber under construction at the time of trial.[9] **NC Exh. 106 at 1.**
- *Kingston:* Complete installation of two scrubbers sufficient to cover all nine EGUs, at an estimated total cost of $359,251,000. *Id.* at 3.
- *John Sevier:* Install scrubbers and SCRs sufficient to clean all four units. Installation of the four necessary SCRs has an estimated total cost of $132,792,000. Installation of one scrubber which will clean all four units is estimated to cost $175,326,000. *Id.* at 2.
- *Widows Creek:* Install scrubbers and SCRs on Units 1–6. Installation of SCRs on each unit has an estimated total cost of $158,024,000. Installation of one scrubber which will clean all six units is estimated to cost $178,232,000. *Id.* at 5.

64. Continual, year-round operation of scrubbers and SCRs on these four plants will enable the plants to achieve

---

8. As explained above, SCRs and SNCRs control $NO_x$, the primary pollutant from which ozone and $PM_{2.5}$ are formed. Scrubbers control SO2, another primary pollutant from which $PM_{2.5}$ is formed. **Findings of Fact 13, 15, 21–23,** *supra.*

9. According to a status update from TVA in January 2009, this scrubber is now installed and in operation.

the following emissions, per EGU. **NC Exh. 97.**

| Plant | Unit | $NO_x$ average emissions rate (lbs/MMBTU) | $NO_x$ emissions in tons per year (TPY) | $SO_2$ average emissions rate (lbs/MMBTU) | $SO_2$ emissions in tons per year (TPY) |
|---|---|---|---|---|---|
| Bull Run | 1 | 0.08 | 2,295 | 0.15 | 4,341 |
| John Sevier | 1 | 0.05 | 372 | 0.15 | 1,023 |
| John Sevier | 2 | 0.05 | 374 | 0.15 | 1,028 |
| John Sevier | 3 | 0.05 | 389 | 0.15 | 1,081 |
| John Sevier | 4 | 0.05 | 360 | 0.15 | 1,000 |
| Kingston | 1 | 0.06 | 323 | 0.15 | 794 |
| Kingston | 2 | 0.06 | 320 | 0.15 | 785 |
| Kingston | 3 | 0.06 | 335 | 0.15 | 822 |
| Kingston | 4 | 0.06 | 326 | 0.15 | 800 |
| Kingston | 5 | 0.06 | 416 | 0.15 | 1,021 |
| Kingston | 6 | 0.05 | 365 | 0.15 | 1,095 |
| Kingston | 7 | 0.05 | 347 | 0.15 | 1,040 |
| Kingston | 8 | 0.05 | 349 | 0.15 | 1,048 |
| Kingston | 9 | 0.05 | 337 | 0.15 | 1,012 |
| Widows Creek | 1 | 0.06 | 246 | 0.15 | 569 |
| Widows Creek | 2 | 0.06 | 263 | 0.15 | 608 |
| Widows Creek | 3 | 0.06 | 287 | 0.15 | 663 |
| Widows Creek | 4 | 0.06 | 261 | 0.15 | 602 |
| Widows Creek | 5 | 0.06 | 277 | 0.15 | 640 |
| Widows Creek | 6 | 0.06 | 271 | 0.15 | 626 |
| Widows Creek | 7 | 0.06 | 892 | 0.56 | 8,950 |
| Widows Creek | 8 | 0.06 | 860 | 0.30 | 4,508 |

65. North Carolina's expert estimated that TVA can retrofit a scrubber in, on average, 27 months. **NC Exh. 83.** Likewise, the expert estimated that TVA could retrofit an SCR in 21 months. **NC Exh. 77.** TVA's expert testified that more lengthy timelines for these projects were necessary. **Transcript at 1997 (three years for an SCR);** *id.* **at 2000 (five years for a scrubber).** The Court finds North Carolina's expert to be more credible in this respect, and accordingly finds that timelines of 21 months and 27 months for SCRs and scrubbers, respectively, are feasible.

66. The Court finds, moreover, that it is financially feasible for TVA to bear the costs of the installation, maintenance, and

year-round operation of the pollution control technology listed above.

## IV. ADMISSIBILITY OF EVIDENCE AND CONCLUSIONS OF LAW

### A. Admissibility of Evidence

1. Both before and during trial, the parties challenged the admissibility of most of the evidence, particularly evidence offered by expert witnesses.

2. The Court took into account the parties' pre-trial motions in limine, as well as their objections in open court, in adjudicating the admissibility of challenged exhibits, expert reports, and testimony.

3. Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert opinion testimony, states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." **Fed.R.Evid. 702; see also Fed.R.Evid. 703 (governing the bases of opinion testimony by expert witnesses).** Rule 702 "imposes a special obligation upon a trial judge 'to ensure that any and all scientific testimony ... is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)) (alteration original).

4. "The touchstone of admissibility [of expert testimony] is whether the testimony will assist the trier of fact." *Proctor v. Tsao,* 164 F.3d 625, 1998 WL 708689 at *3, 1998 U.S.App. LEXIS 23905 at *7 (4th Cir.1998) (unpublished). The admissibility inquiry is no different when the Court sits without a jury. *Friendship Heights Assoc.*

*v. Koubek,* 785 F.2d 1154, 1163 (4th Cir. 1986). Generally, the decision whether to admit or exclude evidence—the so-called "gatekeeping" function—is within the trial court's discretion. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

5. In assessing the admissibility of expert testimony, federal judges must conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. Key factors bearing on this inquiry include (1) whether a "theory or technique ... can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Id.* at 592–94, 113 S.Ct. 2786.

6. As to the admissibility of expert testimony concerning the causal link between a toxic source and a given undesirable health outcome, the Fourth Circuit has observed: "[W]hile precise information concerning the exposure necessary to cause specific harm to humans ... [is] beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 264 (4th Cir. 1999).

7. Guided by these principles, and following careful examination of the proffered experts' curriculum vitae, scientific tech-

niques, and the context of their testimony, the Court admitted the majority of the evidence submitted by the parties during trial. On the whole, the Court concludes that most of the parties' objections to each other's evidence pertained to credibility and weight, rather than to admissibility. *See Woodson v. McGeorge Camping Ctr., Inc.*, 974 F.2d 1333, 1992 WL 225264 at *10, 1992 U.S.App. LEXIS 22747 at *30 (4th Cir.1992) **(unpublished) (making a similar observation in a dispute over expert scientific testimony)**.

## B. Source State Law

■ 8. As the Court has noted in its Memorandum and Order on summary judgment, the controlling authority in this lawsuit is the law of the states in which TVA's plants are located: Alabama, Kentucky, and Tennessee. **Memorandum and Order,** 549 F.Supp.2d at 729; *see Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). Specifically, whether Widows Creek and Colbert are public nuisances in North Carolina is a matter of Alabama law; whether Paradise and Shawnee are public nuisances in North Carolina is a matter of Kentucky law; and whether Bull Run, Kingston, John Sevier, Gallatin, Johnsonville, Cumberland, and Allen are public nuisances in North Carolina is a matter of Tennessee law.

### 1. Alabama

■ 9. In Alabama, a nuisance " 'is anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance.' " *Russell Corp. v. Sullivan*, 790 So.2d 940, 951 (Ala. 2001) **(quoting Ala.Code § 6–5–120).** " 'A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects

on individuals.' " *Id.* **(quoting Ala.Code § 6–5–121).**

10. The Alabama statutes governing nuisance have been liberally interpreted by the Alabama courts. *Tipler v. McKenzie Tank Lines*, 547 So.2d 438, 440 (Ala.1989) (collecting cases). A nuisance "may consist of conduct that is intentional, unintentional, or negligent. Indeed, it may even consist of activities that are conducted in an otherwise lawful and careful manner, as well as conduct that combines with the culpable act of another, so long as it works hurt, inconvenience, or damage to the complaining party." *Id.* **(citing Restatement (Second) of Torts § 821B).**

11. "That which works hurt to another, to satisfy the statutory definition of a nuisance, must comport with the classical tort concepts of duty and causation." *Id.*; *see also E.S. Robbins Corp. v. Eastman Chem. Co.*, 912 F.Supp. 1476, 1494 (N.D.Ala.1995) **("[T]he elements of legal duty and causation between the conduct or activity complained of and the hurt, inconvenience, or damage sued for, must be met in order to establish a statutory nuisance claim in Alabama." (internal quotation marks omitted)).** As to causation, courts "must look to the particular facts of each case to determine whether the party charged with creating and maintaining a nuisance has engaged in a course of conduct, or has permitted to exist a set of circumstances, that, in its natural and foreseeable consequences, proximately caused the hurt, inconvenience, or damage complained about." *Tipler*, 547 So.2d at 440–41.

12. The Alabama Legislature has also passed the Alabama Air Pollution Control Act (AAPCA), which regulates air pollution affecting life or property within Alabama. *See* Ala.Code § 22–28–2(1). As the Court noted in a previous order, this statutory scheme is inapplicable to this

case, because all of Plaintiff's alleged injuries are within North Carolina, not Alabama. **Order, filed May 16, 2008, 2008 WL 2115159, at 5–7.**

■ 13. Based on these principles, the Court concludes that untreated air pollution from TVA's Widows Creek plant is a public nuisance to the citizens of North Carolina. As detailed in the findings of fact, the secondary pollutants of ozone and $PM_{2.5}$ from Widows Creek "work[ ] significant hurt, inconvenience [and] damage" in North Carolina. **Ala.Code § 6–5–120.** Furthermore, TVA's conduct in failing to install readily available pollution controls on Widows Creek constitutes "a course of conduct ... that, in its natural and foreseeable consequences, [is] proximately caus[ing] the hurt, inconvenience, [and] damage." *Tipler,* 547 So.2d at 440–41.

14. For these reasons, an injunction requiring prompt installation and year-round usage of appropriate pollution control technologies at Widows Creek is a necessary outcome of this litigation.

15. As to TVA's other Alabama plant, Colbert, the Court concludes that North Carolina has failed to present sufficient evidence to support a conclusion of public nuisance, as required under applicable Alabama law. Rather, the evidence showed that the effects in North Carolina from air pollution emitted from Colbert are not of measurable significance.

### 2. Kentucky

■ 16. In Kentucky, a public nuisance is an unreasonable interference with a right common to the general public. Circumstances that may sustain a holding that an interference with a public right is unreasonable include whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, whether the conduct is pro-

scribed by a statute, ordinance or administrative regulation, or whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right. *Roberie v. VonBokern,* 2006 WL 2454647 at *3, 2006 Ky. LEXIS 186 at *9–10 (Ky. 2006) **(adopting the test set forth in the Restatement (Second) of Torts § 821 B).**

■ 17. Here, the Court concludes North Carolina has not presented sufficient evidence to prove that TVA's two Kentucky plants, Paradise and Shawnee, emit air pollution that interferes with North Carolinians' health and safety in an unreasonable amount. Like the faraway Colbert plant in Alabama, the two Kentucky plants are too remote to significantly impact air quality in North Carolina to the extent necessary to prove public nuisance.

### 3. Tennessee

■ 18. In Tennessee, a public nuisance is defined as "an act or omission that unreasonably interferes with or obstructs rights common to the public." *Wayne County v. Tenn. Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 283 (Tenn.Ct. App.1988). "[A]nuisance extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property." *Sherrod v. Dutton,* 635 S.W.2d 117, 119 (Tenn.Ct.App. 1982).

20. "The key element of any nuisance is the reasonableness of the defendant's conduct under the circumstances." *Sadler v. State,* 56 S.W.3d 508, 511 (Tenn.Ct.App. 2001) **(citing 58 Am.Jur.2d Nuisances § 76).**

19. " 'What is a reasonable use of one's property and whether a particular use is an unreasonable invasion of another's use

and enjoyment of his property cannot be determined by exact rules, but must necessarily depend upon the circumstances of each case, such as locality and the character of the surroundings, the nature, utility and social value of the use, the extent and nature of the harm involved, the nature, utility and social value of the use or enjoyment invaded, and the like.'" *Sherrod,* 635 S.W.2d at 119 (**quoting** *Caldwell v. Knox Concrete Prods., Inc.,* 54 Tenn.App. 393, 402, 391 S.W.2d 5, 9 (Tenn.Ct.App. 1964)).

■ 21. In this case, North Carolina has presented sufficient evidence that untreated air pollution from the three power plants in eastern Tennessee which are closest to North Carolina—Kingston, Bull Run, and John Sevier—unreasonably interferes with the rights of North Carolina citizens. The Court has carefully considered the factors listed in *Sherrod,* and concludes that TVA's generation of power at low cost to the consuming public has a high social utility. Nonetheless, the vast extent of the harms caused in North Carolina by the secondary pollutants emitted by these plants outweighs any utility that may exist from leaving their pollution untreated. As with the Widows Creek plant in Alabama, TVA's failure to speedily install readily available pollution control technology is not, and has not been, reasonable conduct under the circumstances.

22. For this reason, a judicially-imposed injunction requiring the installation and continual, year-round use of appropriate pollution control technology is appropriate with respect to Kingston, Bull Run, and John Sevier.

23. As to TVA's other Tennessee plants—Allen, Cumberland, Johnsonville, and Gallatin—the Court concludes that there is insufficient evidence that their emissions are having an unreasonable health, safety, or welfare impact on North Carolina, or that they are significantly interfering with or obstructing the North Carolina public's right to breathe clean air. Absent the necessary showing of causation, the Court declines to enjoin these plants' emissions or require them to install pollution control technology.

■ 24. "The American rule that both sides of a civil controversy must pay their own attorney's fees remains the law in the absence of a statutory or contractual provision providing for recovery of attorney's fees or case law that carves out an exception." *Am. Reliable Ins. Co. v. Stillwell,* 336 F.3d 311, 320 (4th Cir.2003) (**internal quotation marks omitted**); *Ex parte Horn,* 718 So.2d 694, 702 (Ala.1998); *City of Louisville v. Slack,* 39 S.W.3d 809, 815 (Ky.2001); *John Kohl & Co. v. Dearborn & Ewing,* 977 S.W.2d 528, 534 (Tenn. 1998). Here, no such statutory or contractual provision applies. Accordingly, North Carolina and TVA must bear their own attorneys' fees and costs.

## V. ORDER

In light of the foregoing findings and conclusions,

**IT IS, THEREFORE, ORDERED** that North Carolina's requested injunctive relief is **GRANTED IN PART AND DENIED IN PART.** A Judgment incorporating these findings and conclusions and setting forth in detail the injunctive relief that will be imposed by the Court is filed contemporaneously herewith.

## *JUDGMENT*

For the reasons set forth in the Memorandum of Opinion filed herewith,

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED** that North Carolina's requested injunctive relief is **DENIED** as to the following TVA

plants: **ALLEN, COLBERT, CUMBERLAND, GALLATIN, JOHNSONVILLE, PARADISE, AND SHAWNEE.**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that North Carolina's request for injunctive relief is **GRANTED** as to the following TVA plants: **BULL RUN, KINGSTON, JOHN SEVIER, AND WIDOWS CREEK.**

1. As to **BULL RUN,** TVA indicated at trial that its single EGU would have an operational scrubber and SCR online as of December 2008, prior to the date of this Judgment. TVA has confirmed that this equipment is now operational. **IT IS, THEREFORE, ORDERED** that the scrubber and SCR shall be properly maintained and operated year-round.

2. As to **KINGSTON,** TVA indicated at trial that two scrubbers are currently under construction, which are intended to scrub all nine EGUs. **IT IS, THEREFORE, ORDERED** that these two scrubbers shall be completed as of **DECEMBER 31, 2010,** and these new scrubbers, along with the nine existing SCRs at Kingston, shall be properly maintained and operated year-round.

3. As to **JOHN SEVIER,** TVA indicated at trial that it plans to build scrubbers and SCRs sufficient to cover all four EGUs. Further, TVA has indicated that one of the EGUs already has a SNCR, and that three more SNCRs will be installed to clean a portion of the $NO_x$ in the interim period before the SCRs are operational. The Court will hold TVA responsible for proceeding according to this plan, including the prompt installation, proper maintenance, and year-round operation of the interim SNCRs until such time as the SCRs come online. **IT IS, THEREFORE, ORDERED** that all scrubbers and SCRs must be installed and operational by **DECEMBER 31, 2011,** and shall thereafter be properly maintained and operated year-round.

4. As to **WIDOWS CREEK, IT IS, THEREFORE, ORDERED** that TVA shall install, properly maintain, and operate year-round both scrubbers and SCRs sufficient to clean all six of the EGUs which presently lack both SCRs and scrubbers. **IT IS FURTHER ORDERED** that, as to the two remaining EGUs which already have SCRs and scrubbers, those SCRs and scrubbers shall be properly maintained and operated year-round. TVA has indicated that one of the two scrubbers was recently modernized, and the other scrubber is scheduled to be modernized. **IT IS FURTHER ORDERED** that TVA is hereby responsible for following through with the planned modernization of the remaining scrubber as of **DECEMBER 31, 2013,** and all eight units at Widows Creek shall have operating SCRs and scrubbers as of **DECEMBER 31, 2013.**

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, consistent with these construction deadlines, TVA shall adhere to the following caps on emissions:

- **BULL RUN, as of TEN DAYS** from entry of this judgment:

| Plant | Unit | $NO_x$ annual average emissions rate (lbs/MMBTU) | $NO_x$ emissions in tons per year (TPY) | $SO_2$ annual average emissions rate (lbs/MMBTU) | $SO_2$ emissions in tons per year (TPY) |
|---|---|---|---|---|---|
| Bull Run | 1 | 0.08 | 2,295 | 0.15 | 4,341 |

- **KINGSTON, as of DECEMBER 31, 2010:**

| Plant | Unit | $NO_x$ annual average emissions rate (lbs/MMBTU) | $NO_x$ emissions in tons per year (TPY) | $SO_2$ annual average emissions rate (lbs/MMBTU) | $SO_2$ emissions in tons per year (TPY) |
|-------|------|------|------|------|------|
| Kingston | 1 | 0.06 | 323 | 0.15 | 794 |
| Kingston | 2 | 0.06 | 320 | 0.15 | 785 |
| Kingston | 3 | 0.06 | 335 | 0.15 | 822 |
| Kingston | 4 | 0.06 | 326 | 0.15 | 800 |
| Kingston | 5 | 0.06 | 416 | 0.15 | 1,021 |
| Kingston | 6 | 0.05 | 365 | 0.15 | 1,095 |
| Kingston | 7 | 0.05 | 347 | 0.15 | 1,040 |
| Kingston | 8 | 0.05 | 349 | 0.15 | 1,048 |
| Kingston | 9 | 0.05 | 337 | 0.15 | 1,012 |

- **JOHN SEVIER,** as of **DECEMBER 31, 2011:**

| Plant | Unit | $NO_x$ annual average emissions rate (lbs/MMBTU) | $NO_x$ emissions in tons per year (TPY) | $SO_2$ annual average emissions rate (lbs/MMBTU) | $SO_2$ emissions in tons per year (TPY) |
|-------|------|------|------|------|------|
| John Sevier | 1 | 0.05 | 372 | 0.15 | 1,023 |
| John Sevier | 2 | 0.05 | 374 | 0.15 | 1,028 |
| John Sevier | 3 | 0.05 | 389 | 0.15 | 1,081 |
| John Sevier | 4 | 0.05 | 360 | 0.15 | 1,000 |

- **WIDOWS CREEK,** as of **DECEMBER 31, 2013:**

| Plant | Unit | $NO_x$ annual average emissions rate (lbs/MMBTU) | $NO_x$ emissions in tons per year (TPY) | $SO_2$ annual average emissions rate (lbs/MMBTU) | $SO_2$ emissions in tons per year (TPY) |
|-------|------|------|------|------|------|
| Widows Creek | 1 | 0.06 | 246 | 0.15 | 569 |
| Widows Creek | 2 | 0.06 | 263 | 0.15 | 608 |
| Widows Creek | 3 | 0.06 | 287 | 0.15 | 663 |
| Widows Creek | 4 | 0.06 | 261 | 0.15 | 602 |
| Widows Creek | 5 | 0.06 | 277 | 0.15 | 640 |
| Widows Creek | 6 | 0.06 | 271 | 0.15 | 626 |
| Widows Creek | 7 | 0.06 | 892 | 0.56 | 8,950 |
| Widows Creek | 8 | 0.06 | 860 | 0.30 | 4,508 |

**IT IS FURTHER ORDERED** that the Office of TVA's Chief Executive Officer shall provide to the Court a semi-annual accounting of TVA's progress in complying

with this Order. The first such accounting shall be filed with the Court no later than **JULY 1, 2009,** with the second report due no later than **JANUARY 1, 2010.** Such reports shall continue to be filed each January 1 and July 1 until TVA has fully complied with the directives herein.

IT IS **FURTHER ORDERED** that each party bear their attorney fees and costs of this action.